# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DOLLAR GENERAL CORPORATION, )
d/b/a DOLGENCORP, LLC, )
d/b/a DG PROMOTIONS INC. )
d/b/a DG RETAIL, LLC, )
            )
             Plaintiff, )
            )
      v. )      Case No. 1:17-cv-588
            )
HECTOR H. BALDERAS, in his official )
capacity as Attorney General for the State )
of New Mexico, )
            )
         and )
            )
STATE OF NEW MEXICO, *ex rel.* )
HECTOR BALDERAS, Attorney General, )
            )
         Defendants. )

## COMPLAINT

1.      Dollar General Corporation, doing business in New Mexico as Dolgencorp, LLC, DG Promotions, LLC, and/or DG Retail, LLC, brings this action pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, against New Mexico Attorney General Hector Balderas and the State of New Mexico *ex rel.* Hector Balderas, for judgment: (A) declaring that Defendants have violated, continue to violate, and will violate federal constitutional and statutory restrictions; (B) declaring that Defendants have violated, continue to violate, and will violate Dollar General's federal constitutional and statutory rights; and (C) enjoining Defendants from such continuing and future violations.

## PARTIES

2.      Dollar General Corporation is a Tennessee corporation with its principal place of business located in Goodlettsville, Tennessee.

3.     Hector Balderas is the New Mexico Attorney General. Attorney General Balderas is the head of the New Mexico Department of Justice. NMSA 1978, § 8-5-1.

4.     The State of New Mexico is named by its relation to Attorney General Balderas. Attorney General Balderas has the statutory authority to enforce laws and is authorized to act on behalf of New Mexico in all actions when the interests of New Mexico require action in his judgment. Attorney General Balderas is also empowered to prosecute all actions and proceedings brought by any state officer or head of a state department, board or commission, or any employee of the state in his official capacity. NMSA 1978, § 8-5-2(B), (C).

## JURISDICTION AND VENUE

5.     This action arises under the United States Constitution and the laws of the United States. This Court therefore has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. § 1983.

6.     Authority to order a reasonable award of attorneys' fees and costs is conferred upon this Court by 42 U.S.C. §§ 1983 and 1988.

7.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

**I.     Federal governance of weights and measures and a national plan for motor oil.**

8.     The United States Constitution expressly grants to Congress the power to legislate particular matters. This includes the power to regulate interstate commerce. U.S. Const. art. I, s. 8, cl. 3. This also includes the power to "fix the Standard of Weights and Measures." U.S. Const. art. I, s. 8, cl. 5 (the "Weights and Measures Clause").

9.     Congress has established the Department of Commerce. 15 U.S.C. § 1501.

2

10.     Within that Department, Congress created "a science, engineering, technology, and measurement laboratory to be known as the National Institute of Standards and Technology," 15 U.S.C. § 272(a), commonly referred to as NIST.

11.     The NIST Director serves "as the President's principal adviser on standards policy pertaining to the Nation's technological competitiveness and innovation ability." 15 U.S.C. § 272(b).

12.     Congress has empowered NIST with a multitude of "functions," and has authorized the NIST Director to take "all actions necessary and appropriate to accomplish" those functions. 15 U.S.C. § 272(b).

13.     One congressionally-authorized responsibility NIST bears is "to cooperate with other departments and agencies of the Federal Government, with industry, with State and local governments, with the governments of other nations and international organizations, and with private organizations in establishing standard practices, codes, specifications, and voluntary consensus standards." 15 U.S.C. § 272(b)(10).

14.     In accordance with this responsibility, NIST has published "Handbook 130" for several decades, culminating in the 2016 edition as adopted by the 100th National Conference on Weights and Measures.

15.     The Department of Commerce publishes in the Federal Registrar notices regarding meetings for the National Conference on Weights and Measures and proposed amendments to Handbook 130.

16.     Handbook 130 details uniform laws and regulations in the area of legal metrology and engine fuel quality.

3

17.    Handbook 130 is based in large part on standards established by the Society of Automotive Engineers ("SAE").

18.    Both NIST and SAE play an important role in the nationwide motor oil industry.

19.    Three different uniform regulations in Handbook 130 relate to the labeling of motor oil products throughout America:

- NIST Uniform Packaging and Labeling Regulation;

- NIST Uniform Regulation for the Method of Sale of Commodities; and

- NIST Uniform Engine Fuels and Automotive Lubricants Regulation.

20.    One uniform law in Handbook 130 relates to the labeling of motor oil products throughout America:

- NIST Uniform Engine Fuels and Automotive Lubricants Inspection Law.

21.    **Handbook 130's NIST Uniform Packaging and Labeling Regulation.** This regulation has a genesis in 1952 to provide states guidance on packaging regulation for consumer commodities (which includes motor oil).

22.    Since that time, this regulation has been continually revised to address the complexities of the ever-expanding packaging industry across America.

23.    According to NIST, 48 states have adopted the Uniform Packaging and Labeling Regulation either as it exists in the 2016 edition of Handbook 130, or as it existed in a previous edition of Handbook 130.

24.    The Uniform Packaging and Labeling Regulation relates, *inter alia*, to the labeling of motor oil products in America.

25.    For example, the Uniform Packaging and Labeling Regulation mandates "information required to appear on a consumer package [to] appear thereon in the English

4

language and shall be prominent, definite, plain, and conspicuous as to size and style of letters and numbers and as to color of letters and numbers in contrast to color or background." NIST Packaging and Labeling Regulation § 8.1.

26.     This general requirement, set forth under the section for consumer packages' "Prominence and Placement," does not mandate that "[a]ll information required to appear on a consumer package" actually appear on the front of any given product's packaging. *See* NIST Packaging and Labeling Regulation § 8.1.

27.     **Handbook 130's NIST Uniform Regulation for the Method of Sale of Commodities.** This regulation has its genesis in 1971 based upon an original concern about the proper units of measurement in the sale of commodities.

28.     Since that time, this regulation has expanded to address concerns about standardized package sizes as well as the general identity of particular commodities. One such commodity is motor oil.

29.     According to NIST, 45 states have adopted the Uniform Regulation for the Method of Sale of Commodities either as it exists in the 2016 edition of Handbook 130, or as it existed in a previous edition of Handbook 130.

30.     The Uniform Regulation for the Method of Sale of Commodities relates, *inter alia*, to the labeling of motor oil products in America.

31.     For example, the Uniform Regulation for the Method of Sale of Commodities requires "[t]he label on any vehicle engine (motor) oil container [to] contain the viscosity grade classification preceded by the letters 'SAE' in accordance with SAE International's latest version of SAE J300, 'Engine Oil Viscosity Classification.'" NIST Method of Sale Regulation § 2.33.1.1.

32.     Another example is that the Uniform Engine Fuels and Automotive Lubricants Regulation requires "[t]he label on any vehicle engine (motor) oil container [to] contain the name, brand, trademark, or trade name of the vehicle engine (motor) oil." NIST Method of Sale Regulation § 2.33.1.2.

33.     Another example is that the Uniform Engine Fuels and Automotive Lubricants Regulation requires "[t]he label on any vehicle engine (motor) oil container [to] contain the engine service category, or categories, displayed in letters not less than 3.18 mm (1/8 in) in height, as defined by[, among other standards,] the latest version of SAE J183, 'Engine Oil Performance and Engine Service Classification (Other than 'Energy Conserving')'." NIST Method of Sale Regulation § 2.33.1.3.

34.     Another example is that the Uniform Engine Fuels and Automotive Lubricants Regulation requires that, if "the vehicle engine (motor) oil in the container . . . does not meet an active API service category as defined by the latest version of SAE J183," then "[t]he label on [the] vehicle engine (motor) oil container . . . shall bear a plainly visible cautionary statement in compliance with the latest version of SAE J183, Appendix A." NIST Method of Sale Regulation § 2.33.1.3.2.

35.     **Handbook 130's NIST Uniform Engine Fuels and Automotive Lubricants Inspection Law and Handbook 130's NIST Uniform Engine Fuels and Automotive Lubricants Regulation.** This law and regulation have a genesis in 1984, when a Motor Fuels Task Force was appointed to develop mechanisms for achieving uniformity in the evaluation and regulation of motor fuels. The Task Force developed the first iteration of this law and regulation.

36.     Later, in 1995, both the law and regulation underwent major, expansive revisions to include all engine fuels, petroleum products, and automotive lubricants.

6

37. In the late 2000s, the law and regulation were further expanded by no longer being limited to only petroleum products but to reflect the addition of new engine fuels to the marketplace.

38. According to NIST, 11 states have adopted the Engine Fuels and Automotive Lubricants Inspection Law either as it exists in the 2016 edition of Handbook 130, or as it existed in a previous edition of Handbook 130.

39. The Engine Fuels and Automotive Lubricants Inspection Law relates, *inter alia*, to the labeling of motor oil products in America.

40. For example, the Engine Fuels and Automotive Lubricants Inspection Law makes it unlawful to represent an automotive lubricant "in any manner that may deceive or tend to deceive the purchaser as to the nature, brand, price, quantity, and/or quality of such products." NIST Engine Fuel Law § 8.1. A violation of this provision can result in civil or criminal penalties. NIST Engine Fuel Law §§ 9.1, 10.1, 10.2.

41. According to NIST, at least 15 states have adopted the Uniform Engine Fuels and Automotive Lubricants Regulation either as it exists in the 2016 edition of Handbook 130, or as it existed in a previous edition of Handbook 130.

42. The Uniform Engine Fuels and Automotive Lubricants Regulation relates, *inter alia*, to the labeling of motor oil products in America.

43. For example, the Uniform Engine Fuels and Automotive Lubricants Regulation requires "[t]he label on any vehicle engine (motor) oil container [to] contain the viscosity grade classification preceded by the letters 'SAE' in accordance with SAE International's latest version of SAE J300, 'Engine Oil Viscosity Classification.'" NIST Engine Fuel Regulation § 3.13.1.1.

7

44.     Another example is that the Uniform Engine Fuels and Automotive Lubricants Regulation requires "[t]he label on any vehicle engine (motor) oil container [to] contain the name, brand, trademark, or trade name of the vehicle engine (motor) oil." NIST Engine Fuel Regulation § 3.13.1.2.

45.     Another example is that the Uniform Engine Fuels and Automotive Lubricants Regulation requires "[t]he label on any vehicle engine (motor) oil container [to] contain the engine service category, or categories, displayed in letters not less than 3.18 mm (1/8 in) in height, as defined by[, among other standards,] the latest version of SAE J183, 'Engine Oil Performance and Engine Service Classification (Other than 'Energy Conserving')'." NIST Engine Fuel Regulation § 3.13.1.3.

46.     Another example is that the Uniform Engine Fuels and Automotive Lubricants Regulation requires that, if "the vehicle engine (motor) oil in the container . . . does not meet an active API service category as defined by the latest version of SAE J183," then "[t]he label on [the] vehicle engine (motor) oil container . . . shall bear a plainly visible cautionary statement in compliance with the latest version of SAE J183, Appendix A." NIST Engine Fuels Regulations § 3.13.1.3.2.

47.     **The Society of Automotive Engineers.** SAE is a nationally-recognized automotive industry association.

48.     SAE produces voluntary and mandatory industry standards as well as specifications for components used in the automotive field.

49.     SAE publishes SAE J183, which details engine oil performance categories and engine service classifications. In short, different categories of motor oil are intended for use with different engine service classifications.

8

50.     SAE publishes SAE J300, which details engine oil viscosity classification.

51.     The Federal Trade Commission has long relied on SAE J183, API 1509, and various NIST standards, including the standards in Handbook 130, in interpreting what is or is not a deceptive act or practice and promulgating regulations.

52.     **API Category SA motor oils.** API Category SA motor oil is intended for use with pre-1931 automobile engines.

53.     To avoid consumer confusion, SAE recommends that a retailer of API Category SA motor oil inform the consumer of the limitations of this motor oil's use.

54.     SAE recommends that such a cautionary statement "should be displayed on each oil container and on any overpack carton in legible and conspicuous type upon a contrasting background." SAE J183 A.2.3.3.

55.     SAE provides the following as a suggested cautionary statement that would be considered "reasonable and prudent by experts in the field of automotive gasoline engine lubrication":

CAUTION:   THIS OIL IS RATED API SA. IT CONTAINS NO ADDITIVES. IT IS NOT SUITABLE FOR USE IN MOST GASOLINE-POWERED AUTOMOTIVE ENGINES BUILT AFTER 1930. USE IN MODERN ENGINES MAY CAUSE UNSATISFACTORY ENGINE PERFORMANCE OR EQUIPMENT HARM.

SAE J183 A.2.3.3.

56.     Because API Category SA motor oils are not an active API service category, NIST requires a plainly visible cautionary statement on such motor oil products that complies with this recommendation. NIST Method of Sale Regulation § 2.33.1.3.2; NIST Engine Fuels Regulations § 3.13.1.3.2.

9

57.     **API Category SF motor oils.** API Category SF motor oil is intended for use with pre-1989 automobile engines.

58.     To avoid consumer confusion, SAE recommends that a retailer of API Category SF motor oil inform the consumer of the limitations of this motor oil's use.

59.     SAE recommends that such a cautionary statement "should be displayed on each container and the corresponding overpack carton in legible and conspicuous type upon a contrasting background." SAE J183 A.2.8.3.

60.     SAE currently provides the following as a suggested cautionary statement that would be considered "reasonable and prudent by experts in the field of automotive gasoline engine lubrication":

> CAUTION:   THIS OIL IS RATED API SERVICE CATEGORY SF. IT IS NOT SUITABLE FOR USE IN MOST GASOLINE POWERED AUTOMOTIVE ENGINES BUILT AFTER 1988. IT MAY NOT PROVIDE ADEQUATE PROTECTION AGAINST THE BUILD-UP OF ENGINE SLUDGE. LATER "S" CATEGORIES ARE SUITABLE OR PREFERRED FOR AUTOMOTIVE ENGINES FORWHICH "SF" OILS WERE SPECIFIED.

SAE J183 A.2.8.3.

61.     Because API Category SF motor oils are not an active API service category, NIST requires a plainly visible cautionary statement on such motor oil products that complies with this recommendation. NIST Method of Sale Regulation § 2.33.1.3.2; NIST Engine Fuels Regulations § 3.13.1.3.2.

## II.     The national market system for motor oil.

62.     Motor oil products reach the general public through an established national market scheme involving different commercial actors. Relevant here, a streamlined

understanding of the market contemplates three commercial actors: the manufacturer, the vendor, and the retailer.

63.     The beginning of this motor oil commercial market scheme is the manufacturer. The manufacturer captures and may also process oil. Once this occurs, the manufacturer needs a buyer.

64.     A manufacturer typically does not solicit buyers directly, but instead operates through vendors to sell motor oil.

65.     Vendors do not look for individual consumers as buyers. Instead, vendors typically seek and find large scale operations to purchase motor oil—including retailers. Vendors may also process the oil as well.

66.     A retailer who purchases motor oil product from a vendor does so with the intent of making that product available to the general public through individual retail purchase.

67.     Many retailers of motor oils, including Dollar General, are self-service stores.

68.     A self-service store is a widespread, national phenomenon whereby commercial enterprises set their goods out for inspection by the general public in aisles.

69.     In the typical self-service store, similar items will be categorized by departments that occupy certain sections within the physical store. Within each department, product placement on a store shelf generally attempts to segment a department by meaningful subcategories and brands, while also addressing the physical requirements of the item or item set.

70.     By custom and practice, customers throughout America know that, when they are in a self-service store, they have the express or implicit permission and invitation to pick up, handle, move, try on, replace, inspect, examine, and carry about merchandise within the store.

71.     This is the defining quality of a self-service store: the customer's ability to serve him or herself by selecting those products he or she believes are appropriate for his or her needs after proper examination and inspection. Thus, self-service.

72.     Self-service is appropriate for motor oils because of the different markets motor oils serve.

73.     For example, different engine oil performance categories are appropriate for different automobile engines. The market for motor oils appropriate for pre-1989 automobile engines includes owners of automobiles that have a pre-1989 engine. This remains true even if motor oils appropriate for post-1988 automobile engines are backwards compatible with older automobile engines. This is particularly true if such backwards compatible motor oils are more expensive than motor oils appropriate for pre-1989 automobile engines.

74.     Notably, the United States Department of Transportation has found, that as of 2009, approximately 14 million household vehicles were manufactured in 1988 or before.

75.     Another example is that customers may desire to use motor oils, otherwise appropriate for use in certain automobile engines, in other types of engines such as farm equipment, construction equipment, or lawnmowers. The market for any given motor oil includes persons who seek to use that motor oil for use in another type of non-automobile engine.

76.     Whether any particular customer is part of any particular motor oil market is known best by that customer.

III.    **Dollar General's DG Auto motor oil products.**

77.     Dollar General is in the business of selling retail products at an affordable price to the general public nationwide.

78.     One such retail product sold by Dollar General is motor oil. Dollar General sells motor oil in many states, including New Mexico. During the relevant time period, Dollar General sold hundreds of thousands of motor oil products in New Mexico. Dollar General continues and will continue to sell motor oil in New Mexico and other states.

79.     Dollar General is not in the business of capturing, manufacturing, bottling, packaging, or processing motor oil prior to presenting motor oil for purchase by the general public.

80.     Since approximately 2010, Dollar General has sold motor oil products under a "DG Auto" label. Dollar General sells three types of DG Auto motor oil products: DG SAE 30, DG SAE 10W-30, and DG SAE 10W-40.

81.     These DG Auto motor oil products have been and continue to be manufactured, labeled, and supplied by third party vendors.

82.     Dollar General uses the self-service store model. Within the typical Dollar General store, there is an automotive aisle.

83.     In that automotive aisle, different motor oil products are located. This includes motor oil products that are sold under other brands, as well as DG Auto motor oil products.

84.     Dollar General permits and invites every customer that shops for motor oil to review the different motor oil options as they sit on the store shelf, and to also pick up, handle, examine, inspect, and otherwise assess each product. This allows the customer to determine whether any given motor oil is the appropriate product best suited for their particular needs.

85.     **DG SAE 30.** Until approximately 2016, the DG SAE 30 motor oil product was API Category SA. Only the API Category SA version of the DG SAE 30 motor oil product is at issue.

13

86. The following is an accurate photo of the front and back of DG SAE 30 (until approximately 2016):



87.    The following is an accurate close-up photo of the DG SAE 30 back label (until approximately 2016):



88.    The DG SAE 30 motor oil product's labeling complies with NIST and SAE.

89.    The DG SAE 30 motor oil product complies with NIST Method of Sale Regulation § 2.33.1.1 and NIST Engine Fuel Regulation § 3.13.1.1 by including "SAE 30" on its front and back labels.

90.    The DG SAE 30 motor oil product complies with NIST Method of Sale Regulation § 2.33.1.2 and NIST Engine Fuel Regulation § 3.13.1.2 by including "DG auto" on its front and back labels.

91.    The DG SAE 30 motor oil product complies with NIST Method of Sale Regulation § 2.33.1.3 and NIST Engine Fuel Regulation § 3.13.1.3 by including "API SERVICE SA" on its back label.

15

92.     The DG SAE 30 motor oil product complies with NIST Method of Sale Regulation § 2.33.1.3.2, NIST Engine Fuels Regulations § 3.13.1.3.2, and SAE J183 § A.2.3.3 by including the following all-capitalized letter cautionary statement in conspicuous type upon a contrasting background on its back label:

> CAUTION — THIS OIL IS RATED API SA. IT CONTAINS NO ADDITIVES. IT IS NOT SUITABLE FOR USE IN MOST GASOLINE POWERED AUTOMOTIVE ENGINES BUILT AFTER 1930. USE IN MODERN ENGINES MAY CAUSE UNSATISFACTORY ENGINE PERFORMANCE OR EQUIPMENT HARM.

93.     The DG SAE 30 motor oil product conforms to SAE J183 by stating on its back label that the motor oil "is a non-detergent motor oil designed for use in older engines where consumption may be high and economical lubricants are preferred." SAE explains that motor oil categorized as API Service SA, like DG SAE 30, "denotes service typical of older engines [that] operated under such mild conditions that the protection afforded by compounded oils is not required." SAE J183 Table A1A. Motor oil categorized as API Service SA was originally used when engines, because of "high internal clearances and [being] poorly sealed[,] consumed and leaked large amounts of oil and required the constant addition (almost daily) of substantial amounts of make-up oil to maintain the proper oil level in the crankcase." SAE J183 § A.2.3.1. When DG SAE 30 states that it is used in older engines that require "high" "consumption" of oil, this is an accurate description of the kinds of engines for which DG SAE 30 is designed.

94.     **DG SAE 10W-30 and DG SAE 10W-40.** Until approximately 2016, the DG SAE 10W-30 and DG SAE 10W-40 motor oil products were API Category SF. Only the API Category SF versions of the DG SAE 10W-30 and DG SAE 10W-40 motor oil products are at issue.

16

95.     The following is an accurate photo of the front and back of DG SAE 10W-30 (until approximately 2016):



96.     The following is an accurate close-up photo of the DG SAE 10W-30 back label (until approximately 2016):

# SAE 10W-30
## Motor Oil

API SERVICE SF

SAE 10W-30 motor oil is an all-season, multi-viscosity, heavy duty detergent motor oil recommended for gasoline engines in older model cars and trucks. This oil provides oxidation stability, antiwear performance, and protection against deposits, rust and corrosion.

CAUTION – THIS OIL IS RATED API SERVICE CATEGORY SF. IT IS NOT SUITABLE FOR USE IN MOST GASOLINE POWERED AUTOMOTIVE ENGINES BUILT AFTER 1988. IT MAY NOT PROVIDE ADEQUATE PROTECTION AGAINST THE BUILD-UP OF ENGINE SLUDGE.

SAE 10W-30 ES UN ACEITE DE MOTOR MULTI-VISCOSO CON DETERGENTE PARA EQUIPO PESADO Y, PARA TODAS LAS ESTACIONES DEL AÑO. ES RECOMENDADO PARA MOTORES DE GASOLINA DE AUTOS Y CAMIONES DEL AÑO '88 AÑOS ANTERIORES.

Warning: Harmful if swallowed – KEEP OUT OF REACH OF CHILDREN



Prevention: Use personal protective equipment as required. Wash face, hands and any exposed skin thoroughly after handling. Do not eat, drink or smoke when using this product.
Response: If exposed or concerned: Get medical advice/attention

IF ON SKIN: Wash with plenty of soap and water. Wash contaminated clothing before reuse. If skin irritation persists: Get medical advice/attention.

IF SWALLOWED: Call a POISON CENTER or doctor/physician if you feel unwell – Rinse mouth

Storage: Dispose of contents/container to an approved waste disposal plant

97.    The following is an accurate photo of the front and back of DG SAE 10W-40 (until approximately 2016):



98.    The following is an accurate close-up photo of DG SAE 10W-40 back label (until approximately 2016):

SAE10W-40
Motor Oil        API SERVICE SF
SAE 10W-40 motor oil is an all-season, multi-viscosity, heavy duty detergent
motor oil recommended for gasoline engines in older model cars and trucks. This
oil provides oxidation stability, antiwear performance, and protection against
deposits, rust and corrosion.
CAUTION — THIS OIL IS RATED API SERVICE CATEGORY SF. IT IS NOT SUITABLE FOR
USE IN MOST GASOLINE POWERED AUTOMOTIVE ENGINES BUILT AFTER 1988. IT MAY
NOT PROVIDE ADEQUATE PROTECTION AGAINST THE BUILD-UP OF ENGINE SLUDGE.
WARNING: Contains petroleum lubricant. Avoid prolonged contact. Wash skin
thoroughly with soap and water. Launder or discard soiled clothes. Consumer
product- Refer to the Safety Data Sheet for OSHA GHS classification and additional
product information.
DON'T POLLUTE - CONSERVE RESOURCES. RETURN USED OIL TO THE COLLECTION CENTER.
This engine oil's service level is in accordance with the designated SAE J300
engine oil viscosity classification and suitable for former SAE J-183 engine oil
service classification as designated on this label.

99.     The DG SAE 10W-30 and DG SAE 10W-40 motor oil products' labeling
complies with NIST and SAE.

100.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products comply with
NIST Method of Sale Regulation § 2.33.1.1 and NIST Engine Fuel Regulation § 3.13.1.1 by
including "10W-40" and "10W-30" on their front labels and "SAE 10W-40" and "SAE 10W-30"
on their back labels.

101.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products comply with
NIST Method of Sale Regulation § 2.33.1.2 and NIST Engine Fuel Regulation § 3.13.1.2 by
including "DG auto" on their front and back labels.

102.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products comply with
NIST Method of Sale Regulation § 2.33.1.3 and NIST Engine Fuel Regulation § 3.13.1.3 by
including "API SERVICE SF" on their back label.

103.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products comply with
NIST Method of Sale Regulation § 2.33.1.3.2, NIST Engine Fuels Regulations § 3.13.1.3.2, and

20

SAE J183 § A.2.8.3 by including the following all-capitalized letter cautionary statement in conspicuous type upon a contrasting background on its back label:

> CAUTION — THIS OIL IS RATED API SERVICE CATEGORY SF. IT IS NOT SUITABLE FOR USE IN MOST GASOLINE POWERED AUTOMOTIVE ENGINES BUILT AFTER 1988. IT MAY NOT PROVIDE ADEQUATE PROTECTION AGAINST THE BUILD-UP OF ENGINE SLUDGE.

104.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products conform to NIST regulations by stating on their front labels that the motor oil "Lubricates and protects your engine." NIST defines motor oil as an "oil that reduces friction and wear between the moving parts within a reciprocating internal combustion engine" and "serves as a coolant." NIST Engine Fuels Regulation § 1.43.

105.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products conform to SAE J300 by stating on their back labels that the motor oil "is an all-season, multi-viscosity, heavy duty detergent motor oil recommended for gasoline engines in older model cars and trucks." SAE explains how these motor oils correlate with engines that can start at low and normal temperatures. SAE J300 §§ 4, 5. These products are therefore "all-season" motor oils. SAE J300 also explains how "[m]ultiviscosity-grade oil[]" or "multigrade[]" oil is "defined by" a correlation with engines starting at low and normal temperatures. SAE J300 § 3. These products are therefore "multi-viscosity" motor oils. The recommendation for use "for gasoline engines in older model cars and trucks" is essentially identical to the conspicuous cautionary statements also included on the back labels in compliance with NIST Method of Sale Regulation § 2.33.1.3.2, NIST Engine Fuels Regulations § 3.13.1.3.2, and SAE J183 § A.2.8.3.

106.    The DG SAE 10W-30 and DG SAE 10W-40 motor oil products conform to SAE J300 by stating on their back labels that the motor oil "provides oxidation stability, antiwear

performance, and protection against deposits, rust and corrosion." SAE explains that "[o]ils developed for [API Service SF] provide increased oxidation stability and improved antiwear performance relative to oils that meet the minimum requirements for API Service Category SE." SAE J183, Table A1F. "These oils also provide protection against engine deposits, rust, and corrosion." SAE J183, Table A1F.

107. The label for each respective DG Auto motor oil product is uniform throughout the United States.

108. Defendants' enforcement actions seek, through state executive fiat, to change a label that complies with federal law to adjust to more stringent standards—standards that are arbitrarily created by a state executive power—via the judicial system, despite Congress's exclusive constitutional role.

109. Defendants would therefore impose expense upon Dollar General and impose a burden upon its sale of the motor oil products throughout the United States.

**IV.     The pending multidistrict litigation proceedings.**

110. Starting in late 2015 and continuing even through May 2017, over twenty individuals have filed suit against Dollar General (and/or related Dollar General entities) alleging consumer deception, breach of warranty, and/or unjust enrichment claims. These individual suits are brought on a putative class basis.

111. In these lawsuits, the plaintiffs allege that Dollar General's labeling, marketing, and sale of the DG Auto motor oil products is misleading. Specifically, the plaintiffs allege that they were misled or deceived into purchasing the DG SAE 30 motor oil product and did not know that the motor oil was intended for use with pre-1931 automobile engines and/or were misled or deceived into purchasing the DG SAE 10W-30 and/or DG SAE 10W-40 motor oil

products and did not know that the motor oil was intended for use with pre-1989 automobile engines.

112. On March 8, 2016, the Judicial Panel on Multidistrict Litigation created Multidistrict Litigation No. 2709 to determine whether coordinated pretrial proceedings related to Dollar General's marketing and sales of its DG Auto motor oil products should proceed.

113. On June 2, 2016, the JPML determined that such coordinated pretrial proceedings should proceed, and that the MDL proceedings should be centralized in the United States District Court for the Western District of Missouri. The Honorable Judge Gary A. Fenner is presiding over those MDL proceedings.

114. The JPML originally transferred eighteen cases to the MDL proceedings.

115. Since then, the JPML has transferred four additional cases to the MDL proceedings.

116. Additionally, new individuals have tried to join the MDL proceedings simply by being listed as named plaintiffs to an amended consolidated complaint filed in the MDL without having a separate individual action.

**V.    Kanner & Whiteley, L.L.C.'s financial and professional investment.**

117. This private litigation has largely been the product of a single law firm's efforts: Kanner & Whiteley, L.L.C.

118. Mr. Allan Kanner is a founding member of Kanner & Whiteley.

119. Kanner & Whiteley began their pursuit of bringing these claims into court at least as early as June 2015, if not earlier. In court filings, Kanner & Whiteley claimed to have undertaken an "investigat[ion]" of the sale of the DG SAE 30, DG SAE 10W-30, and DG SAE 10W-40 motor oil products which led to the filing of suit.

23

120.    Kanner & Whiteley's efforts were rewarded when Mr. Kanner was appointed lead counsel in the MDL proceedings. Mr. Kanner includes his status as MDL lead counsel on his firm biography webpage. https://www.kanner-law.com/professionals/allan-kanner/.

121.    As of March 2016, before MDL consolidation, Kanner & Whiteley were lead counsel in eighteen of the pending cases—the vast majority of cases pending at that time.

122.    In court filings, Kanner & Whiteley claimed that, as lead counsel, they were "coordinating the efforts of all co-counsel."

123.    The full nature of this "investigation" and coordination is still unclear. There are a multitude of indications that certain portions of this "investigation" and coordination were improper.

124.    For example, in the motor oil litigation originating in the Southern District of Texas, Mr. David Wilson Pace, who was working under Kanner & Whiteley's coordination, actively recruited two of the named plaintiffs.

125.    Specifically, Mr. Pace instructed two different individuals to go to a Dollar General store and purchase DG Auto motor oil products for the sole purpose of becoming a named plaintiff.

126.    After such purchases were made, complaints were filed identifying those individuals as named plaintiffs. These individuals alleged that they were deceived into purchasing a DG Auto motor oil product because of those motor oils' shelf placement and labeling.

127.    In light of the circumstances that surrounding these two individuals' purchase of DG Auto motor oil, those pleading allegations were false.

128.    Although Mr. Pace was the lawyer who electronically filed the complaints that contained these false allegations, Mr. Kanner was listed on the signature block for both pleadings and had been designated as lead counsel.

129.    During an in-chambers conference before the judge presiding over the Texas proceedings, Judge Ewing Werlein, Jr., Mr. Pace explained to the Court his recruitment activities regarding the plaintiffs named in that litigation. This was the first Dollar General learned of Mr. Pace's activities.

130.    Mr. Kanner was present at this conference, as was Ms. Cynthia St. Amant, a member of Kanner & Whiteley.

131.    Separate from the recruitment of named plaintiffs in that Texas litigation, other facts suggest other plaintiffs in related motor oil litigation were similarly recruited.

132.    For example, in many of the other cases in which Kanner & Whiteley were lead counsel, several named plaintiffs in different proceedings purchased a DG Auto motor oil product either on the same day or within a few days of one another, and they similarly filed their claims on the same day or within a few days of one another.

133.    Finally, in light of no curative action from Kanner & Whiteley to address the potential misconduct of their co-counsel, Dollar General filed a motion for relief on the recruitment activity—a motion filed with the Western District of Missouri because litigation had, by that time, been transferred for MDL proceedings.

134.    Subsequent to that motion, the Court ordered Mr. Kanner to "conduct a thorough investigation" into the plaintiff recruitment. Mr. Kanner was instructed to file a report to inform the Court "which attorneys participated in Plaintiff recruitment and which Plaintiffs were recruited, and set[] forth any justification for the attorneys' actions." Dollar General was given

the opportunity to file a response to that report, if necessary. Only then would the Court determine what, if any, sanctions are appropriate for such conduct.

135.    Mr. Kanner's investigative report and Dollar General's response were filed under seal. The Court has not yet acted on this recruitment issue.

136.    It is unknown whether the New Mexico Attorney General's office was aware of this conduct and the pending recruitment issue in the MDL when it hired Kanner & Whiteley as its outside counsel, or the circumstances under which that representation was initiated (for example, by New Mexico or by members of the Kanner & Whiteley firm).

## VI.    **Directed or assisted by private attorneys, the New Mexico Attorney General intends to prosecute Dollar General.**

137.    The New Mexico Attorney General is authorized to bring an action in the name of New Mexico under New Mexico's Unfair Practices Act ("UPA"), NMSA 1978, § 57-12-1, *et seq*.

138.    Such an action may only be brought when the Attorney General "has reasonable belief" that a person is, has, or is about to violate the UPA. NMSA 1978, § 57-12-8(A).

139.    In such actions, the Attorney General "may recover, on behalf of the state of New Mexico, a civil penalty" of up to $5,000 per violation. *Id*. § 57-12-11.

140.    The New Mexico Attorney General is authorized to issue civil investigative demands when he or she "has reason to believe" that any person is "in possession, custody or control of an original or copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription or other tangible document or recording" believed to be related to the an "investigation of a probable violation of the [UPA]." NMSA 1978, § 57-12-12(A).

141.     The New Mexico Attorney General also is authorized to bring public enforcement actions pursuant to the New Mexico False Advertising Act ("FAA"), NMSA 1978, Ann. § 57-15-1, *et seq.*

142.     Such an action for damages may only be brought by the New Mexico Attorney General. *Id.* §§ 57-15-4; 57-15-5.

143.     In an FAA public enforcement proceeding, the Attorney General may recover civil penalties of up to $500 per violation, which "shall inure to [New Mexico]." *Id.*

144.     Before the New Mexico Attorney General commences against any person an action under the FAA, the Attorney General is required by law to provide that person appropriate notice of the proposed action pursuant to NMSA 1978, § 57-15-3.

145.     On February 22, 2017, Assistant Attorney General Scott Cameron, on behalf of Defendants, sent a civil investigative demand to Dollar General under NMSA 1978, § 57-12-12(A). A true and correct copy of this demand is attached to this complaint as **Exhibit A.**

146.     The civil investigative demand was captioned "IN THE MATTER OF DOLLAR GENERAL CORPORATION, dba DOLGENCORP, LLC, DG PROMOTIONS, LLC, and DG RETAIL, LLC" and assigned an internal case number NMAGO No. 201609-01459. Ex. A at 1. The document "commanded" Dollar General to produce certain documents to Mr. Cameron on or before March 8, 2017.

147.     The civil investigative demand asserted that Defendants had:

> probable cause to believe that Dollar General, in the regular course of trade or commerce in New Mexico, has knowingly made false or deceptive statements to consumers and/or omitted facts from consumers and/or falsely advertised products to consumers in connection with offering for sale obsolete motor oil products that are unsuitable for use in modern automobiles at Dollar General stores in New Mexico.

Ex. A at 1-2.

148.    The civil investigative demand stated that its production demands were not mere requests but requirements. The demand threatened court intervention should Dollar General fail to comply. Ex. A at 10.

149.    On April 7, 2017, after receiving a 30-day extension, Dollar General provided its response to the civil investigative demand refuting Defendants' allegations.

150.    Gathering documents and drafting a response to Defendants cost Dollar General significant money and time.

151.    Despite Dollar General's clear repudiation of Defendants' claims, on May 11, 2017, Defendants, through Assistant Attorney General Cameron, sent to Dollar General a notice of proposed action under NMSA 1978, § 57-15-3. A true and correct copy of this notice is attached to this complaint as **Exhibit B**.

152.    The notice claimed that "[i]t has been determined that in your marketing and advertising of [Dollar General] branded obsolete motor oil products in New Mexico since at least 2010, [Dollar General has] violated the [New Mexico] False Advertising Act." Ex. B at 1.

153.    The notice of proposed action, written in letter format, was copied to Kanner & Whiteley. Ex. B at 1.

154.    Mr. Kanner of Kanner & Whiteley is lead counsel in the motor oil MDL proceedings currently pending before the Western District of Missouri.

155.    Upon information and belief, and based upon conversations with Assistant Attorney General Cameron and other communications, Kanner & Whiteley has been retained by Defendants to conduct enforcement proceedings under the FAA and/or the UPA on behalf of Defendants.

156.    Upon information and belief, Defendants have ceded some or all control of the public enforcement proceedings related to Dollar General to the private entity Kanner & Whiteley and its attorney(s).

157.    Upon information and belief, Defendants have likely entered into a payment structure with Kanner & Whiteley for its litigation of the public enforcement proceedings, or Kanner & Whiteley are otherwise receiving some economic or financial benefit from its involvement in the public enforcement proceedings.

158.    This is despite the fact that no provision in New Mexico law empowers the Attorney General to outsource his enforcement authority under the FAA or the UPA to private lawyers pursuant to what is likely an ad-hoc contingency-fee arrangement.

159.    As the chief law officer of New Mexico, in accordance with relevant provisions of state and federal law, the Attorney General has a responsibility to see that justice is done for all persons, including persons such as Dollar General, who are targeted with enforcement actions.

160.    In prosecuting actions to recover civil penalties, the Attorney General is obligated to serve the public interest. In some cases, the public interest may call for limiting the scope of the action or abandoning the action altogether rather than seeking to maximize the amount of civil penalties.

161.    Kanner & Whiteley's professional and financial stake in any public enforcement proceedings against Dollar General, particularly in concert with their private lawsuits against Dollar General, inject bias into the process, which substantially increases the risk of overzealous prosecution and other problems.

162.    Under a contingency-fee arrangement, contingency-fee counsel stand to gain substantial amounts of money based on the outcome of their enforcement action against Dollar

General, if successful. The contingency-fee arrangement would thus create a powerful incentive for contingency-fee counsel to focus single-mindedly on maximizing the amount of civil penalties recovered on behalf of New Mexico from Dollar General.

163.    Because of their professional and financial stake in the outcome of an enforcement action and the pending MDL litigation, contingency-fee counsel will be disinclined to exercise restraint, such as by limiting the scope of the action if doing so would advance the public interest.

164.    The pernicious consequences of the payment arrangement between Defendants and Kanner & Whiteley are exacerbated by Kanner & Whiteley's lack of public accountability.

165.    The mere investigation, not to mention the threat of impending litigation, of Dollar General in the name of New Mexico but orchestrated by private attorneys with direct professional and financial stakes in both these investigations and the private litigation MDL proceedings violates Dollar General's constitutional rights. No adequate remedy at law exists for this ongoing violation.

**VII.    The Attorney General's prosecution of civil penalties against Dollar General for sale of DG Auto motor oil products would interfere with the federal regulatory scheme.**

166.    Conduct authorized by a specific consumer protection statutory scheme, for example, the Weights and Measure regime, cannot result in liability under a general consumer protection statute. Conduct cannot be lawful and unlawful at the same time.

167.    If a particular act or practice is permitted by the federal government or a state yet results in a violation in a different state, a patchwork quilt of inconsistent regulations results.

168.    These inconsistencies burden companies doing business in multiple states and hamper interstate commerce.

169. Defendants permitting the sale of non-active service category motor oils within New Mexico, but simultaneously punishing Congress's policy choice of approving the labeling language for those non-active service category motor oils (containing appropriate cautionary statements) is preempted.

170. Defendants' prosecution of their action against Dollar General would pose an obstacle to securing uniformity of the national Weights and Measures standards.

171. If Defendants prevailed on their claims, the federal framework for achieving uniformity in Weights and Measures would be disrupted.

172. The products at issue and the manner in which they are labeled are fully authorized by federal (and state) law under the congressionally established Weights and Measures scheme. Defendants' attempt to declare these products as misleading or unlawful seeks to prohibit the sale of these products both retroactively and prospectively. This is improper and invades the province of the legislative branch to enact—or not enact—such a ban.

173. While the UPA and FAA encompass some consumer protection concerns, they do so at a level of generality as to provide little standard of application. The contrast between the defined standards of the NIST Handbook 130 (and the rest of the federal regulatory scheme) with the UPA and FAA (as Defendants attempt to apply them) could not be more stark.

174. Defendants' prosecution, if successful, would lead to conflicting standards with multiple courts in different states determining whether these products' labels are appropriate. One court may set one standard, a court in another state may set another, and a judge in another state a third.

175. Prosecution of Defendants' suit would interfere with the methods by which the federal regulatory scheme was designed to reach its goal. Defendants' actions (and others like it)

have the potential to undermine the regulatory structure and become a serious interference with the achievement of the full purposes and objectives of Congress.

## COUNT I
### 42 U.S.C. § 1983: Procedural Due Process and/or Equal Protection Violation

176.     Dollar General incorporates all allegations in all preceding paragraphs.

177.     Attorney General Balderas, in his official capacity as Attorney General of New Mexico, acting under color of state law and on behalf of New Mexico, has entered into or otherwise approved an agreement hiring biased outside counsel to prosecute, or alternately, to assist him in investigating and prosecuting Dollar General under the UPA and the FAA.

178.     As a direct and proximate result of Defendants' actions, coercive state powers have been delegated to private lawyers with clear, direct, and substantial professional and financial interests in the outcome of punitive investigative and enforcement actions that must be prosecuted in the public interest or not at all.

179.     As a direct and proximate result of Defendants' actions, the fairness of the FAA and UPA investigations and enforcement actions has been obstructed, and Dollar General's right to due process under the Fourteenth Amendment to the United States Constitution has been violated.

180.     Dollar General has a right to engage in lawful commerce through the marketing and sale of Dollar General's lawful products. This is a core business activity of Dollar General, developed through an investment of time and money.

181.     Dollar General has a property interest in the intellectual property that forms Dollar General's products, in its investments in advertising and/or research, and in the revenue derived from the manufacture and sale of Dollar General's products.

182.    The Fourteenth Amendment Due Process clause requires that Defendants not deprive Dollar General of its property interests without due process of law. Defendants' actions have violated Dollar General's right to due process of law.

183.    Defendants' actions, under color of law, violate the equal protection afforded by the Fourteenth Amendment.

184.    Defendants have subjected Dollar General to a deprivation of its right to equal protection by creating a custom and/or policy through which Defendants seek to prohibit Dollar General from using labeling on its products that comply with the federal and state regulatory scheme. This unilateral prohibition violates the equal protection clause of the Fourteenth Amendment because federal law allows for the use of such labeling. By discriminating against Dollar General for its use of this labeling, Defendants violate the Fourteenth Amendment guarantee of equal protection.

185.    The past, ongoing, and future violations of Dollar General's rights to due process and equal protection have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

186.    The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

## COUNT II
### Declaratory Judgment Act: Procedural Due Process and/or Equal Protection Violation

187.    Dollar General incorporates all allegations in all preceding paragraphs.

188.    Attorney General Balderas, in his official capacity as Attorney General of New Mexico, acting under color of state law and on behalf of New Mexico, has entered into or otherwise approved an agreement hiring biased outside counsel to prosecute, or alternately, to assist him in investigating and prosecuting Dollar General under the UPA and the FAA.

33

189. As a direct and proximate result of Defendants' actions, coercive state powers have been delegated to private lawyers with clear, direct, and substantial professional and financial interests in the outcome of punitive investigative and enforcement actions that must be prosecuted in the public interest or not at all.

190. As a direct and proximate result of Defendants' actions, the fairness of the FAA and UPA investigations and enforcement actions has been obstructed, and Dollar General's right to due process under the Fourteenth Amendment to the United States Constitution has been violated.

191. Dollar General has a right to engage in lawful commerce through the marketing and sale of Dollar General's lawful products. This is a core business activity of Dollar General, developed through an investment of time and money.

192. Dollar General has a property interest in the intellectual property that forms Dollar General's products, in its investments in advertising and/or research, and in the revenue derived from the manufacture and sale of Dollar General's products.

193. The Fourteenth Amendment Due Process clause requires that Defendants not deprive Dollar General of its property interests without due process of law. Defendants' actions have violated Dollar General's right to due process of law.

194. Defendants' actions, under color of law, violate the equal protection afforded by the Fourteenth Amendment.

195. Defendants have subjected Dollar General to a deprivation of its right to equal protection by creating a custom and/or policy through which Defendants seek to prohibit Dollar General from using labeling on its products that comply with the federal and state regulatory scheme. This unilateral prohibition violates the equal protection clause of the Fourteenth

Amendment because federal law allows for the use of such labeling. By discriminating against Dollar General for its use of this labeling, Defendants violate the Fourteenth Amendment guarantee of equal protection.

196.     The past, ongoing, and future violations of Dollar General's rights to due process and equal protection have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

197.     The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

198.     Dollar General is entitled to a Declaration that Defendants' investigation and prosecution violates Dollar General's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution.

## COUNT III
### 42 U.S.C. § 1983: Dormant Commerce Clause Violation

199.     Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

200.     Under the Dormant Commerce Clause, states are prohibited from directly regulating interstate commerce of a character that should be or is the subject of uniform national regulation.

201.     Dollar General operates its business throughout the United States, including within New Mexico and the surrounding states.

202.     Dollar General markets motor oil that complies with the federal scheme contemplated by the NIST standards.

203.     Dollar General wants to continue transporting, marketing, and selling its motor oil products through interstate commerce into and out of New Mexico.

35

204. Defendants' actions make compliance with the federal scheme and their state-imposed requirements impossible.

205. Defendants' prosecution of Dollar General under the UPA and FAA for conduct that complies with the national standards imposes a burden upon interstate commerce.

206. Defendants' actions arbitrarily discriminate against Dollar General's interstate business by preventing it from uniformly operating its business throughout the United States.

207. Defendants, by their actions, are directly regulating interstate commerce that is the subject of a national scheme contemplated by the United States Congress.

208. Defendants, by their actions, impose a substantial and detrimental burden on interstate commerce that clearly exceeds local benefits.

209. Moreover, Defendants' prosecution of Dollar General under the UPA and the FAA does not advance any putative purposes that are not themselves unconstitutional.

210. At best, Defendants' prosecution of Dollar General under the UPA and the FAA is directed against harms that are hypothetical and speculative, if not simply pretextual due to Defendants' affiliation with Kanner & Whiteley.

211. The past and ongoing violations of the Dormant Commerce Clause have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

212. The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

## COUNT IV
### Declaratory Judgment Act: Dormant Commerce Clause Violation

213. Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

36

214. Under the Dormant Commerce Clause, states are prohibited from directly regulating interstate commerce of a character that should be or is the subject of uniform national regulation.

215. Dollar General operates its business throughout the United States, including within New Mexico and the surrounding states.

216. Dollar General markets motor oil that complies with the federal scheme contemplated by the NIST standards.

217. Dollar General wants to continue transporting, marketing, and selling its motor oil products through interstate commerce into and out of New Mexico.

218. Defendants' actions make compliance with the federal scheme and their state-imposed requirements impossible.

219. Defendants' prosecution of Dollar General under the UPA and FAA for conduct that complies with the national standards imposes a burden upon interstate commerce.

220. Defendants' actions arbitrarily discriminate against Dollar General's interstate business by preventing it from uniformly operating its business throughout the United States.

221. Defendants, by their actions, are directly regulating interstate commerce that is the subject of a national scheme contemplated by the United States Congress.

222. Defendants, by their actions, impose a substantial and detrimental burden on interstate commerce that clearly exceeds local benefits.

223. Moreover, Defendants' prosecution of Dollar General under the UPA and the FAA does not advance any putative purposes that are not themselves unconstitutional.

224.     At best, Defendants' prosecution of Dollar General under the UPA and the FAA is directed against harms that are hypothetical and speculative, if not simply pretextual due to Defendants' affiliation with Kanner & Whiteley.

225.     The past and ongoing violations of the Dormant Commerce Clause have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

226.     The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

227.     Dollar General is entitled to a Declaration that Defendants' prosecution violates the Dormant Commerce Clause of the Constitution.

## COUNT V
### 42 U.S.C. § 1983: Supremacy Clause Violation
### Weights and Measures Clause

228.     Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

229.     The United States Constitution confers upon Congress the exclusive power to "fix the Standard of Weights and Measures." U.S. Const. art. I, s. 8, cl. 5.

230.     The power to fix weights and measures is constitutionally committed to the Legislative Branch of the federal government.

231.     The NIST regulations and NIST laws detailed in this complaint fall within the scope of this constitutional commitment.

232.     This constitutional commitment creates a boundary between horizontal powers, whereby it is improper for a judiciary entity to alter, disrupt, and rule upon the weights and measures fixed by Congress.

233.    The structural system created by the Constitution subordinates the state sovereigns to the federal sovereign. U.S. Const. art. IV, s. 2, cl. 2.

234.    This supremacy of federal law creates a boundary between vertical powers, whereby it is improper for a state sovereign to alter, disrupt, and rule upon the weights and measures fixed by the federal sovereign.

235.    Defendants are seeking to impose their own substantive requirements on the weights and measures scheme exclusively committed to Congress.

236.    Defendants' requirements are more rigorous than, and punish compliance with, federal standards.

237.    Defendants' requirements, imposed by a state executive, invade a field committed to the federal Congress, occupied by federal regulation, and conflict with federal law.

238.    The investigation and prosecution of Dollar General under the UPA and the FAA for the sale of DG Auto motor oil products violate the rights of Dollar General as guaranteed by Article I, section 8, clause 5 of the United States Constitution and Article VI, section 2, clause 2 by imposing a penalty on Dollar General's compliance with federal law, and otherwise engaging in state enforcement of a state standard against Dollar General that exceeds the sovereign authority of the New Mexico executive in contravention of Constitution.

239.    The past and ongoing violations of the Supremacy Clause have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

240.    The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

## COUNT VI
### Declaratory Judgment Act: Supremacy Clause Violation
### Weights and Measures Clause

241.    Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

242.    The United States Constitution confers upon Congress the exclusive power to "fix the Standard of Weights and Measures." U.S. Const. art. I, s. 8, cl. 5.

243.    The power to fix weights and measures is constitutionally committed to the Legislative Branch of the federal government.

244.    The NIST regulations and NIST laws detailed in this complaint fall within the scope of this constitutional commitment.

245.    This constitutional commitment creates a boundary between horizontal powers, whereby it is improper for a judiciary entity to alter, disrupt, and rule upon the weights and measures fixed by Congress.

246.    The structural system created by the Constitution subordinates the state sovereigns to the federal sovereign. U.S. Const. art. IV, s. 2, cl. 2.

247.    This supremacy of federal law creates a boundary between vertical powers, whereby it is improper for a state sovereign to alter, disrupt, and rule upon the weights and measures fixed by the federal sovereign.

248.    Defendants are seeking to impose their own substantive requirements on the weights and measures scheme exclusively committed to Congress.

249.    Defendants' requirements are more rigorous than, and punish compliance with, federal standards.

250. Defendants' requirements, imposed by a state executive, invade a field committed to the federal Congress, occupied by federal regulation, and conflict with federal law.

251. The investigation and prosecution of Dollar General under the UPA and the FAA for the sale of DG Auto motor oil products violate the rights of Dollar General as guaranteed by Article I, section 8, clause 5 of the United States Constitution and Article VI, section 2, clause 2 by imposing a penalty on Dollar General's compliance with federal law, and otherwise engaging in state enforcement of a state standard against Dollar General that exceeds the sovereign authority of the New Mexico executive in contravention of Constitution.

252. The past and ongoing violations of the Supremacy Clause have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

253. The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

254. Dollar General is entitled to a Declaration that Defendants' prosecution of Dollar General under the FAA and the UPA violates the Supremacy Clause of the United States Constitution.

## COUNT VII
### 42 U.S.C. § 1983: Supremacy Clause Violation
### The NIST Standards

255. Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

256. Through NIST, Congress has established a national regulatory scheme that regulates the labels of motor oil products.

257. The Federal Trade Commission has long relied on that regulatory scene to enforce federal law and to promulgate regulations.

41

258. Defendants are seeking to impose their own substantive requirements on the labeling of motor oil products that are more rigorous than federal standards. These requirements invade a field occupied by federal regulation and conflict with federal law.

259. The investigation and prosecution of Dollar General under the UPA and the FAA violate the rights of Dollar General as guaranteed by Article I, section 8, clause 5 of the United States Constitution, the Supremacy Clause, and the statutory laws of the United States by imposing a penalty on Dollar General's compliance with federal law, and otherwise enforcing against Dollar General a state law that is preempted by federal law.

260. The past and ongoing violations of the Supremacy Clause have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

261. The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

## COUNT VIII
### Declaratory Judgment Act: Supremacy Clause Violation
### The NIST Standards

262. Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

263. Through NIST, Congress has established a national regulatory scheme that regulates the labels of motor oil products.

264. The Federal Trade Commission has long relied on that regulatory scene to enforce federal law and to promulgate regulations.

265. Defendants are seeking to impose their own substantive requirements on the labeling of motor oil products that are more rigorous than federal standards. These requirements invade a field occupied by federal regulation and conflict with federal law.

266. The investigation and prosecution of Dollar General under the UPA and the FAA violate the rights of Dollar General as guaranteed by Article I, section 8, clause 5 of the United States Constitution, the Supremacy Clause, and the statutory laws of the United States by imposing a penalty on Dollar General's compliance with federal law, and otherwise enforcing against Dollar General a state law that is preempted by federal law.

267. The past and ongoing violations of the Supremacy Clause have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

268. The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

269. Dollar General is entitled to a Declaration that Defendants' prosecution of Dollar General under the FAA and the UPA violates the Supremacy Clause of the Constitution.

## COUNT IX
### 42 U.S.C. § 1983: First Amendment – Commercial Speech Doctrine

270. Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

271. Dollar General has a constitutionally protected liberty interest in the free expression of truthful commercial advertisements, unmolested by Defendants.

272. Defendants' actions violate Dollar General's rights to commercial speech guaranteed to it by the First Amendment to the United States Constitution.

273. Specifically, Defendants, acting under color of law and on behalf of New Mexico, have and continue to subject Dollar General to a deprivation of its rights to free speech by creating a custom and/or policy that unconstitutionally restrains the use of truthful advertising related to lawful activities, which is protected by the First Amendment. Furthermore, the

43

commercial speech restrained by Defendants' actions is not inherently misleading under state or federal law.

274. The past and ongoing violations of the First Amendment have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

275. The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

## COUNT X
### Declaratory Judgment Act: First Amendment – Commercial Speech Doctrine

276. Dollar General incorporates by reference herein the allegations of the preceding paragraphs.

277. Dollar General has a constitutionally protected liberty interest in the free expression of truthful commercial advertisements, unmolested by Defendants.

278. Defendants' actions violate Dollar General's rights to commercial speech guaranteed to it by the First Amendment to the United States Constitution.

279. Specifically, Defendants, acting under color of law on behalf of New Mexico, have and continue to subject Dollar General to a deprivation of its rights to free speech by creating a custom and/or policy that unconstitutionally restrains the use of truthful advertising related to lawful activities, which is protected by the First Amendment. Furthermore, the commercial speech restrained by Defendants' actions is not inherently misleading under state or federal law.

280. The past and ongoing violations of the First Amendment have caused actual and irreparable harm for which Dollar General has no adequate remedy at law.

281. The harm experienced by Dollar General as a result of Defendants' actions will continue until the Court grants the relief to which Dollar General is entitled.

282. Dollar General is entitled to a Declaration that it is free to use the labeling of the products at issue under the First Amendment to the United States Constitution.

## PRAYER FOR RELIEF

Dollar General prays for the following relief:

(a) A declaration that Defendants' actions violate Dollar General's due process and equal protection rights;

(b) A declaration that Defendants' actions violate the Dormant Commerce Clause;

(c) A declaration that Defendants' actions violate the Supremacy Clause;

(d) A declaration that Defendants' actions violate the Weights and Measures Clause;

(e) A declaration that Defendants' actions violate the national scheme of weights and measures;

(f) A declaration that Defendants' actions violate the First Amendment;

(g) A declaration that Defendants' actions conflict with federal constitutional and statutory law;

(h) A declaration that Dollar General complies with the national requirements for the marketing of its motor oil products;

(i) Preliminary and permanent injunctive relief enjoining Defendants from continuing their violation of the United States Constitution, federal law, and federal regulations;

(j) Preliminary and permanent injunctive relief enjoining Defendants from continuing the investigation as controlled or influenced by Kanner & Whiteley;

(k) Preliminary and permanent injunctive relief enjoining Defendants from filing suit under the FAA and the UPA while under the control or influence of Kanner & Whiteley;

(l)     An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(m)     Such other and further relief as the Court deems just and proper.

DATED: May 25, 2017                 Respectfully submitted,

                                    RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

                            By:     _____
                                    Todd E. Rinner
                                    Jeffrey M. Croasdell
                                    Post Office Box 1888
                                    Albuquerque, New Mexico 87103
                                    Telephone:  (505) 765-5900
                                    Email:  trinner@rodey.com
                                            jcroasdell@rodey.com
                                    *Attorneys for Plaintiff Dollar General Corporation*

                                    and

                                    (*not yet admitted pro hac, identified for convenience only*)
                                    MCGUIREWOODS LLP
                                    R. Trent Taylor
                                    Perry W. Miles, IV
                                    Jontille D. Ray
                                    Travis C. Gunn
                                    800 East Canal Street
                                    Richmond, VA 23219-3916
                                    Telephone: (804) 775-1182
                                    Email:  rtaylor@mcguirewoods.com
                                            pmiles@mcguirewoods.com
                                            jray@mcguirewoods.com
                                            tgunn@mcguirewoods.com
                                    *Attorneys for Plaintiff Dollar General Corporation*

46